IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 22, 2005

## STATE OF TENNESSEE v. PAUL NEIL LAURENT

**Appeal from the Criminal Court for Davidson County**
**No. 2003-B-1165   Mark J. Fishburn, Judge**

---

**No. M2005-00289-CCA-R3-CD - Filed February 27, 2006**

---

The appellant, Paul Neil Laurent, was indicted in 2003 for twelve counts of various crimes allegedly committed against his step-daughter and daughter.  After a bench trial, the appellant was convicted of aggravated kidnapping, attempted aggravated sexual battery, aggravated sexual battery, two counts of sexual battery by an authority figure, and one count of attempted child neglect.  The appellant received a total effective sentence of seventeen years.  The appellant appeals, arguing that:  (1) the trial court erred by denying the motion for judgment of acquittal and motion to dismiss  regarding the charge of aggravated kidnapping; (2) the trial court erred in determining that the appellant was guilty of attempted aggravated sexual battery and aggravated sexual battery because the evidence was insufficient to support the convictions; and (3) the trial court erred in sentencing the appellant.  For the following reasons, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES, J. joined and DAVID G. HAYES, J., filed a dissenting opinion.

James O. Martin, III, Nashville, Tennessee, for the appellant, Paul Neil Laurent.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Bernard McEvoy, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On June 6, 2003, the appellant was indicted by a Davidson County Grand Jury for aggravated kidnapping, attempted aggravated rape, aggravated sexual battery, attempted incest, four counts of aggravated sexual battery by an authority figure, attempted child neglect, and three counts of sexual battery.

The appellant waived his right to a jury trial. At trial, A.K.[1], testified that she was the eighteen-year-old step-daughter of the appellant. At the time of trial, the victim was a senior in high school. The victim stated that she and the appellant had a good relationship when the appellant married her mother, approximately three years prior to the trial, until an episode that occurred when she was in tenth grade. While her mother was out of town on business, the victim caught the appellant hiding in her closet while she was getting dressed.

Several days later, while her mother was still out of town, the appellant took the victim to a movie. At the movie, the appellant offered alcohol to the victim, which she pretended to sip so that the appellant would be "satisfied." When they arrived home, the victim testified that there was a box of chocolate-covered cherries lying on her bed with a pair of her underwear wrapped around them, as well as a vase of flowers on her dresser. The victim claimed that she was "disgusted" and confronted the appellant about the items. According to the victim, the appellant confessed that he had seen her undress a couple of times while hiding in her closet. The victim reported the incident to her mother.

On November 24, 2002, the victim and her fourteen-month old sister, M.L,[2] were home with the appellant while her mother was at work. She noticed that the appellant was watching a videotape of one of her dance performances from school. The victim described this as "unusual." That afternoon, the victim woke up from a nap and went into the kitchen to look for something to eat. She noticed that the appellant was "messing with his pants." At that point, the victim stated that the appellant approached her and stated, "I've been thinking about you and I'm crazy about you." The victim ran for the back door, but the appellant stepped in front of it, blocking her path. The victim then tried to run for her bedroom, but the appellant pushed her down before she could reach the door. After falling to the ground, the victim stated that she "wound up" in her bedroom with the appellant. The appellant was "on top" of her and she kept repeating "No, [appellant], please don't do this." The victim explained that she kept trying to lock her legs, but the appellant would use his knee to open them up. She remembered that the appellant held both of her arms and pressed her back against the bed. She believed that the appellant was trying to rape her.

After struggling for a while, the appellant and the victim ended up on the floor, talking. Sometime during the struggle, the victim bit the appellant on the inside of his elbow. The victim thought the appellant stopped because she had asked him to repeatedly. Then, the appellant told the victim that he "was going to do this because he was never going to see her again and that he had to because he and her mother were going to get a divorce." The victim testified that the appellant also told her that he was doing this because she had "teased" him.

The victim tried to calm the appellant down, telling him that she would never tell anyone what happened. The appellant left the room, and the victim proceeded to lock her door, change

---

[1] It is the policy of this Court not to identify the victims of sexual abuse.

[2] M.L is the biological daughter of the appellant and A.K.'s mother, Maria Laurent.

clothes, gather her purse together (including a can of mace) and try to get out of her bedroom window. She could not open the window and decided to wait in her room until the appellant left the house to pick her mother up from work.

During this time, the appellant continued to talk to the victim through the door. The appellant shook the door handle and was eventually able to open the door. As he came in the room, the victim noticed a rope-like object in his hand. The victim sprayed the appellant in the eyes with mace. The appellant pushed the victim onto the bed and got back on top of her, holding her forearms and pinning them to the bed. The appellant rubbed his eyes against the victim's eyes, burning them with mace. The victim had difficulty seeing with the mace in her eyes. The pain in her eyes lasted for approximately two hours. The appellant took the mace away, threw it down and tried to tie the victim's right hand with a bathrobe sash.

The victim tried to kick her window out in an attempt to escape. The victim was able to turn over onto her stomach and started to crawl off the bed. The appellant grabbed her around the knees and pushed her over, hurting her back. The victim continued to ask the appellant to stop to which he eventually replied, "Okay. I'm not going to fuck you, I just want to kiss you down there." The victim testified that she understood the appellant to mean that he wanted to kiss her vagina. During this time, the victim pleaded with the appellant to allow her to wash out her eyes.

In response to the appellant's statements, the victim kicked off her shoes and unbuttoned her jeans. She testified that she only cooperated with the appellant to get him to calm down. The appellant removed the victim's jeans and left her underwear on. The appellant demanded to see the victim's breasts. The appellant lifted the victim's sweater and placed his hand on her breast. She was not wearing a bra at the time.

After the appellant took her pants off, he licked the victim on the outside of her underwear on her vagina. She testified that he licked her on the outside and inside of the vagina. Specifically, she stated that his tongue, covered by the material from her underwear, entered the inside of her vagina. The victim testified that the appellant continued to lick her vagina "like a dog licking water" for approximately two minutes. Then, the victim got up and told the appellant that she needed to wash her eyes. The appellant asked for a kiss, so the victim complied because she thought if she cooperated with the appellant, she would not get raped.

At that time, the victim went to her bathroom and began to rinse out her eyes. The appellant followed her, grabbed her by the buttocks and slid his hand across her behind. The appellant also washed his eyes. The victim then left her bathroom and went to the appellant's bathroom. The appellant followed her and once again placed his hand on her buttocks. The victim then told the appellant that she was going back to her bathroom, but instead ran out the back door of the house and down the street wearing only a sweater, underwear and socks.

The victim ran down the street, trying to flag down passing vehicles. She finally stopped a van containing Dorothy Ailey and her husband. The Aileys stopped when they saw the victim

running toward the car, waving her hands and crying "let me in." Ms. Ailey described the victim as "hysterical." Ms. Ailey remembered that the victim had no pants on at the time. The couple let the victim into their vehicle, where she gave them her address and stated "he was going to kill her if she didn't get away." Ms. Ailey let the victim use her cellular phone to call her mother. The victim told her mother that she had been raped. The couple drove the victim to the nearby Shell station, called the police and waited until the police arrived.

Hannah Tiblier, a nurse practitioner with Metro General Hospital, testified that she performed a medical exam on the victim on November 24, 2002. The exam involved a general examination of the body and more specific exam of the genitalia. The victim told Ms. Tiblier the following:

> He [the appellant] came into my room with a rope in his hand. I sprayed him in the eyes with mace and he threw me on the bed and tried to rub it in my eyes. He tied my right arm to the bed, but I got out of it. I bit him hard on the arm. He pulled my pants off and put his head down there, my panties were still on though. He touched my breasts and he kissed me. I kept rinsing my eyes. The burning was unbelievable. I finally ran out of the house and didn't have my pants on. I wanted out of there.

The victim told Ms. Tiblier that she was not sure if there was sexual penetration. During the examination, Ms. Tiblier noticed a fresh scratch over the victim's right rib cage as well as a fresh scratch on the back of her right wrist. As part of the examination, labial swabs were collected from the victim. Additionally, the victim's panties were collected as evidence in order to preserve any possible fluids located on them.

After the call came in regarding the victim, Nicole Swisher, a Sergeant with the Metropolitan Nashville Police Department responded to the appellant's residence on November 24, 2002. As the officers entered the house, the smell of mace was very strong. Sergeant Swisher located a baby, fourteen-month-old M.K., inside the house alone, asleep in a stroller. Once they rescued the child, they exited the house to preserve the scene.

Robert Carrigan, a detective with the Metropolitan Nashville Police Department met with the victim and her mother, Maria Laurent, at the residence after the incident. Detective Carrigan noticed that the victim's room was in disarray and that there was a bottle of chemical spray or mace and a belt from a bathrobe on the floor. The appellant was not at the scene, and his car was missing.

The next morning, Detective Carrigan received word that the appellant was at his residence. When they arrived, the appellant was not present. However, after a search Detective Carrigan and other officers discovered a suitcase packed with men's clothing in a shed behind the house.

Later that day, Detective Carrigan met Ms. Laurent at the house where they found a letter from the appellant on the kitchen table. The letter stated as follows:

Dear Maria, I've never been more sorry in all my life. I should have listened to you and sought some help. I love you and [our daughter] dearly. I am such a weak individual. I should have been the adult and walked away. [Victim], I am truly sorry. I have a huge problem that started when I was just a kid. I have nowhere to go and nowhere to turn to except Jesus. If there's any way that this situation can be fixed or mended, whatever you say Maria, I'll do. I still have my beeper with me, so you can reach me that way, if you want to. Please say a prayer for me. All my love, [Appellant].

Ms. Laurent identified the handwriting as that of the appellant. Upon direction from Detective Carrigan, Ms. Laurent placed several calls to the pager number that the appellant left in the letter. During one of those conversations, the appellant agreed to meet Ms. Laurent in the parking lot of Antioch High School. Ms. Laurent waited for the appellant at the designated location, but the appellant never appeared. The appellant eventually turned himself in to the police on December 9, 2002.

Hunter Greene, a DNA analyst with the Tennessee Bureau of Investigation, testified as an expert in serology. Ms. Greene testified that chemical analysis of the victim's underwear revealed the presence of alpha amylase, a component of saliva, in concentrations consistent with the presence of saliva.

Maria Laurent, the victim's mother, testified that she has two other daughters in addition to the victim. Her two young daughters are biologically the appellant's. Ms. Laurent recalled that at some point after her marriage to the appellant, she and one of her daughters traveled to Dallas, Texas in connection with her work for American Airlines. Sometime later she learned that while she was gone, the appellant hid in the victim's closet and saw her get undressed. The appellant explained that he was playing hide-and-go-seek and had accidentally seen her undress. The appellant also told Ms. Laurent that he gave the victim alcohol, chocolate and roses in an attempt to apologize for hiding in her closet.

Ms. Laurent testified that the appellant had a particular interest in performing oral sex with her while she was wearing underwear. Ms. Laurent further stated that she had never discussed the appellant's desires or interests in regards to oral sex with the victim.

On November 24, 2002, Ms. Laurent was at work. The appellant was supposed to pick her up when her shift was over at 7:00 p.m. However, Ms. Laurent left work early when she received a telephone call from the victim. Over the course of the next few days, Ms. Laurent was able to reach the appellant on his cell phone several times. At least one of these conversations was recorded.

Ms. Laurent confirmed that during several of these conversations, the appellant apologized for his actions and promised to get professional help. The appellant told Ms. Laurent that the victim

was "teasing" him and that he was sexually aroused by her. Ms. Laurent even discovered that the appellant had placed a new doorknob on the victim's bedroom door.

After hearing the evidence, the trial court found the appellant guilty of aggravated kidnapping, attempted aggravated sexual battery, aggravated sexual battery, two counts of sexual battery by an authority figure, and attempted child neglect. The trial court sentenced the appellant to twelve years for aggravated kidnapping, six years for attempted aggravated sexual battery, twelve years for aggravated sexual battery, five years for each count of sexual battery by an authority figure, and two years for attempted child neglect. The trial court ordered that the sentences for aggravated kidnapping, aggravated sexual battery, and attempted aggravated sexual battery run concurrently to each other. The trial court also ordered that the sentences for sexual battery by an authority figure and attempted child neglect run concurrently to each other, but consecutively to the charges on the first three counts, for a total effective sentence of seventeen years.

The appellant filed a motion for new trial. At the hearing on the motion, the trial court reversed and dismissed one of the charges for sexual battery by an authority figure based on insufficiency of the evidence and reduced the sentence on the aggravated kidnapping from twelve years to eleven years. Despite the trial court's actions, the appellant's total effective sentence remained seventeen years.

The appellant filed a timely notice of appeal. On appeal, the appellant presents the following issues for our review: (1) whether the trial court erred by denying the motion for judgment of acquittal and motion to dismiss as to the aggravated kidnapping charge; (2) whether evidence was sufficient to sustain the convictions for aggravated sexual battery and attempted aggravated sexual battery; and (3) that his sentence is excessive and that the trial court erred in ordering consecutive sentencing.

Analysis

Alleged Violation of State v. Anthony

The appellant first argues that the trial court erred by failing to grant his motion for judgment of acquittal and his motion to dismiss in regards to the charge of aggravated kidnapping under Count One of the indictment. Specifically, the appellant argues that "under the facts as presented in this case, the appellant could not have been convicted of both aggravated kidnapping and the various sexual battery offenses as his established course of conduct did not violate both statutes and the aggravated kidnapping offense should be merged." The appellant goes on to argue that "the evidence of aggravated kidnapping was merely incidental conduct to the other charges and due process prohibits a separate conviction for kidnapping," citing State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), and State v. Barney, 986 S.W.2d 5435 (Tenn. 1999). The State disagrees, arguing that the trial court properly denied the motion to dismiss and motion for judgment of acquittal.

According to Tennessee Rule of Criminal Procedure 29(a):

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

This Court has noted that "[i]n dealing with a motion for judgment of acquittal, unlike a motion for new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

Aggravated kidnapping is defined as false imprisonment committed: "(1) to facilitate the commission of any felony or flight thereafter; . . . ; (3) With the intent to inflict serious bodily injury or to terrorize the victim or another; [or] (4) Where the victim suffers bodily injury; . . . ." Tenn. Code Ann. § 39-13-304(a). False imprisonment is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

The appellant argues that State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), prevents his convictions for aggravated kidnapping and other sexual crimes. In Anthony, our supreme court addressed the issue of whether dual convictions for armed robbery and aggravated kidnapping

violated the due process guarantees of Article I, section eight of the Tennessee Constitution. The court concluded that when a confinement, movement, or detention is "essentially incidental" to an accompanying felony, such as robbery or rape, it is not sufficient to support a separate conviction for kidnapping. Id. at 306. The court warned that the kidnapping statute should be narrowly construed "so as to make its reach fundamentally fair and to protect the due process rights of every citizen . . . ." Id. In other words, before a defendant may be convicted of a kidnapping charge, the trial court must determine whether the confinement, movement, or detention [involved in the individual's case] is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction. Id. at 306. "[O]ne method of resolving this question is to ask whether the defendant's conduct 'substantially increased [the] risk of harm over and above that necessarily present in the [attending] crime . . . itself.'" Id. (quoting State v. Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)).

In State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), the supreme court further refined the approach to be taken when analyzing these issues. See id. at 535. The reviewing court must ascertain "whether the movement or confinement was beyond that necessary to consummate the act of" the accompanying offense. Id. "If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. The Dixon court clearly stated that the intent is not to provide a defendant with "a free kidnapping merely because he [or she] also committed" the primary offense, but rather merely to "prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of" the accompanying crime. See id. at 534.

At trial, the victim testified that she:

[W]ent to take a nap that day and when I came out of my room I went to the kitchen to go get something to eat and he had went [sic] to my bathroom, when he came out of my bathroom, he was like messing with his pants. Then he, like, came over, walked up to me and said, "[Victim], I've been thinking about you and I'm crazy about you," and stuff like that, and I went to go run for the back door and that's when he came and blocked it and then I ran to my room . . . .

The victim then stated that the appellant "pushed" her and made her fall before she could get to her room. They struggled on the floor as the appellant held her arms and tried to force her legs open. When the appellant finally left her room, the victim locked her door, changed into street clothes, collected her purse and mace and tried to escape through the bedroom window. The appellant forced the door open and came into the room with a bathrobe sash in his hand. The victim sprayed the appellant with mace and another struggle ensued. During the struggle, the appellant attempted to tie the victim's hands with the sash. The appellant rubbed the mace from his eyes into the victim's eyes. The struggle ended only when the victim allowed the appellant to fondle her breasts and perform oral sex on her. The appellant eventually allowed the victim to wash out her eyes, but

followed her closely to the bathroom and fondled her buttocks as she tried to rinse her eyes. The victim went to another bathroom, but the appellant continued to follow her and fondle her buttocks. The victim left again, this time running out the door and escaping from the house.

After a review, we conclude that the proof was sufficient for the trial court to find the elements of aggravated kidnapping. Further, we determined that the aggravated kidnapping was not merely incidental to the other acts of sexual battery committed by the appellant. The trial court found that:

> [T]he confinement was beyond that necessary to commit the offense of sexual battery and prevented the victim from summoning help.

We agree. The appellant's restraint of the victim continued beyond the moments when the victim struggled to repel the appellant, through periods of calm during which the appellant expressed his intention to "do this [perform sexual acts]" to the victim. Thus, confinement in this case was beyond that necessary to commit the accompanying felony of aggravated sexual battery and attempted aggravated sexual battery.

Turning to the second prong of the analysis, we conclude that the confinement of the victim did in fact hinder her from summoning help; thus, the appellant's risk of apprehension was lowered. It was not until after the victim, wearing only a sweater and underwear, escaped out of the door of the residence and flagged down a passing vehicle that she was able to get away from the appellant and contact the police. Accordingly, we conclude that the appellant's conviction for aggravated kidnapping did not violate due process. This issue is without merit.

Sufficiency of the Evidence for Attempted Aggravated Sexual Battery
and Aggravated Sexual Battery

Next, the appellant complains that there was not sufficient evidence of bodily injury to support the convictions for attempted aggravated sexual battery and aggravated sexual battery. The State contends that the evidence was sufficient to support the convictions.

As stated previously, when a defendant challenges the sufficiency of the evidence, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Tuggle, 639 S.W.2d at 914. Thus, the relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. Again, the State is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom and this Court is precluded from re-weighing the evidence. See Morgan, 929 S.W.2d at 383; Tuggle, 639 S.W.2d at 914.

Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" where "the defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-504(a)(2). "Bodily

injury" is defined as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(2). The appellant does not dispute that "unlawful sexual contact" occurred, only that the evidence of bodily injury was not sufficient enough to sustain the convictions. Specifically, the appellant complains that lack of independent corroboration of the victim's testimony should have prohibited him from being convicted.

The record shows that, at trial, the victim testified that she suffered scratches, a sore back, and irritation to her eyes as a result of her struggles with the appellant. Ms. Tiblier, the nurse practitioner who examined the victim, testified that the victim reported that there was mace in her eyes. When officers arrived at the residence, the smell of mace was still strong in the air. Ms. Tiblier also observed two scratches on the victim, one over her right rib cage and one on the back of her right wrist. The trial court determined that the victim suffered bodily injury as a result of the appellant's actions. The trial court was in the best position to evaluate the credibility of the witnesses. The evidence was sufficient to support a determination that the victim suffered bodily injury at the hands of the appellant. This issue is without merit.

Sentencing

Finally, the appellant raises several complaints with regard to his sentence. Specifically, the appellant argues that the trial court erred in not considering his work history as a mitigating factor "despite clear proof of such in the record" and erred in sentencing him to the maximum sentence for aggravated sexual battery and attempted aggravated sexual battery. Further, the appellant argues that the trial court erred in "finding the defendant had an extensive criminal history and relying on this factor for consecutive sentencing." The State contends that there was little evidence in the record to support the appellant's work history and that the trial court properly ordered consecutive sentencing.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

Turning more specifically to the facts of this case, the defendant was convicted of aggravated kidnapping, a class B felony; attempted aggravated sexual battery, a class C felony; aggravated

sexual battery, a class B felony; two counts of sexual battery by an authority figure, both class C felonies; and attempted child neglect, a class E felony. For class B, C and E felonies, the starting point for sentencing determinations is the minimum of the range. See Tenn. Code Ann. § 40-35-210(c). Undisputably, the appellant was a Range I offender; thus, for aggravated kidnapping and aggravated sexual battery, eight years was the minimum sentence against which the trial court was to balance any mitigating and enhancement factors. Tenn. Code Ann. § 40-35-111(b)(2). For the convictions for attempted aggravated sexual battery and sexual battery by an authority figure, the minimum sentence is three years. Tenn. Code Ann. § 40-35-111(b)(3). For the class E felony of attempted child neglect, the minimum sentence in the range is one year. Tenn. Code Ann. § 40-35-111(b)(5).

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

In the case herein, the trial court applied the following enhancement factors to the appellant's conviction for aggravated kidnapping: (1) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(2)(2004); (2) the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, Tenn. Code Ann. § 40-35-114(8)(2004); (3) the defendant abused a position of private trust, Tenn. Code Ann.§ 40-35-114(16)(2004); and (4) the crime was committed under circumstances under which the potential for bodily injury to a victim was great, Tenn. Code Ann. § 40-35-114(17)(2004).[3] As a result of the enhancement factors, the trial court enhanced the appellant's sentence from eight years to twelve years.[4] With respect to the appellant's conviction for attempted aggravated sexual battery, the trial court determined that enhancement factors (2), (8), and (16) applied. The trial court enhanced the appellant's sentence for attempted aggravated sexual battery from three years to six years, based on the application of the enhancement factors. For the appellant's aggravated sexual battery conviction, the trial court again determined that enhancement factors (2), (8), and (16) applied, enhancing the sentence from eight years to twelve years. With respect to the appellant's two convictions for sexual battery by an authority figure, the trial court applied enhancement factors (2) and (8), enhancing the sentences from three years to five years. At the hearing on the motion for new trial, the trial court reversed one of the appellant's convictions for sexual battery by an authority figure based on the fact that the

---

[3]Since the appellant's sentencing hearing, Tennessee Code Annotated section 40-35-114 has been amended. To maintain consistency, we have chosen to utilize the subsection numbers applicable at the time of the appellant's conviction and sentencing.

[4]At a later hearing, the trial court reduced the appellant's sentence on the aggravated kidnapping conviction from twelve years to eleven years.

evidence was insufficient. Finally, the trial court determined that enhancement factors (2) and (16) applied to the appellant's conviction for attempted child neglect, enhancing the sentence from one year to two years. The trial court applied "family and community support" as a mitigating factor to all of the appellant's convictions in determining the sentences. However, the trial court stated that it did not "put a lot of weight on the mitigating factor because he apparently has had that through most of his adult life and didn't take advantage of it."

On appeal, the appellant argues that the trial court erred in not considering his work history as a mitigating factor "despite clear proof of such in the record" and erred in sentencing him to the maximum sentence of twelve years for aggravated sexual battery and six years for attempted aggravated sexual battery. While a defendant is normally entitled to some consideration at sentencing as a result of his work ethic because a "consideration of a defendant's work history is consistent with the purposes and principles of the Sentencing Act," State v. Kelley, 34 S.W.3d 471, 483 (Tenn. Crim. App. 2000), the trial court herein determined that the appellant did not have a substantial or outstanding work history. The proof showed that the forty-four-year-old appellant worked for Aircraft Services International Group in Reserve, Louisiana, from October 1, 1994, until he resigned on November 1, 2002, and that he worked for Diversified Well Logging in Reserve, Louisiana, from February 1 to March 1 of 2003. No other information or testimony was provided to the trial court with reference to the appellant's work history. Further, trial counsel for the appellant did not point to any other significant information about the appellant's work history during the sentencing hearing. In light of Kelley, it was error for the trial court to refuse to consider the appellant's work history as a mitigator. However, we conclude that the error was harmless. The appellant's work history in this case, had it been considered as a mitigator, would have availed him little. There was no specific testimony about the appellant's work history, save the length of time he had worked for two companies in Louisiana and that information was provided by the appellant during preparation of his presentence report.

Next, although not raised by either party on appeal, we note that enhancement factors may be considered only if they are appropriate for the offense, and not themselves essential elements of the offense. State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001). Enhancement factor (8), "the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement" is an essential element of the offenses of aggravated sexual battery, attempted aggravated sexual battery and sexual battery by an authority figure, as each crime requires unlawful "sexual contact." "Sexual contact" includes "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Thus, enhancement factor (8) cannot properly be used to enhance sentences for these offenses. State v. Kissinger, 922 S.W.2d 482, 489-90 (Tenn. 1996). Despite the trial court's improper application of this enhancement factor to aggravated sexual battery, attempted aggravated sexual battery and sexual battery by an authority figure, we conclude that the application of enhancement factors (2) and (16) justify the sentences imposed by the trial court for attempted aggravated sexual battery and

aggravated sexual battery. Further, we conclude that the application of enhancement factor (2) justifies the sentence imposed by the trial court for the conviction of sexual battery by an authority figure.

Accordingly, we determine that the evidence does not preponderate against the sentencing determinations made by the trial court as to the length of the sentences. With the exception of the application of enhancement factor (8) to the appellant's sentences for aggravated sexual battery, attempted aggravated sexual battery and sexual battery by an authority figure, the trial court properly complied with the sentencing act, starting at the minimum sentence, enhancing the sentence as appropriate and considering as a mitigating factor the appellant's family and community support. This issue is without merit.

## Consecutive Sentencing

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one (1) offense, the trial court shall order the sentence to run either consecutively or concurrently. The trial court may order the sentences to run consecutively if the trial court finds by a preponderance of the evidence that certain criteria enumerated in Tennessee Code Annotated section 40-35-115(b) are present. One of the provisions allowing consecutive sentencing provide that consecutive sentencing is warranted if: "The defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). Further, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). The decision to impose concurrent or consecutive sentences, however, is a matter entrusted to the sound discretion of the trial court. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997).

In the case herein the trial court determined that consecutive sentencing was warranted because the appellant's record of criminal activity was extensive. Specifically, the trial court commented:

> The key issue in this case in the Court's mind was whether or not consecutive sentencing should be imposed. There's no basis for any type of mandatory consecutive sentencing. There are a number of statutory provisions involving discretionary consecutive sentencing. I do not find that he is a professional criminal. He is an offender whose record of criminal activity, however, is extensive. And, again, I believe criminal activity just doesn't go to how many times you have been convicted of a crime, it goes to the way you have spent your life. And in this case, he has spent his life more wrapped up in criminal activity than he ever thought being wrapped up in raising, nurturing a family and raising a family' therefore, I do find that that particular factor applies. I do not believe, and although I think he's got some mental situations, I do not believe that that particular factor applies in the context that it is intended under the statute. And I'm not sure that the person who wrote the

-13-

sexual - - psychosexual evaluation was a psychiatrist anyway, so I do not find that that applies.

The dangerous offender, I think there are certainly elements of that that would apply; however, there are a number of factors that have to be looked at. And in looking at all the factors under the circumstances, I do not believe him to be a dangerous offender.

The one that the State argues most, there are certainly aspects of that that clearly apply to this case. There are certainly aggravating circumstances rising from relationship in that this was the father-in-law, I mean, the stepfather, and the mother entrusted both of these children to him. However, in comparing this factor with some of the other factors, I'm not sure that it fulfills what is contemplated by this particular provision. In most of the other cases that I reviewed, the time of the sexual activity went undetected, it was years. And while there was some sexually deviant behavior going on in this household, where he was being a voyeur and peering through closet windows, there was evidence primarily, not really supported by anything else, but by his own admission, where he was patting the victim on the buttocks at times waking her up in the morning that seemed to be of more recent vintage, his sexual desire seemed to grow and grow and grow. And the anger, I think was mentioned at one point, the anger of not being able to get to her I think finally overtook him, and I perceive this as the only real sexual act that is contemplated by the statute. And the nature and the scope of the sexual act, I mean, I think any sexual act involving your stepdaughter, a minor, is unnatural. It all was one event. There was no penetration. In fact, I think the evidence – and part because the victim was so cool-headed, to some extent, throughout this whole thing and I don't know what would have happened had she not responded the way she did, I think her testimony was, "to keep him calm." But it did involve primarily, other than, I think the breast[s] were - - touching bare breast, and the cunnilingus was done on the outside of her pants, while repulsive and under no circumstances never be justified or accepted hopefully in our society, I don't find it to be, again, of such the nature as contemplated by the statute for this particular factor in consecutive sentencing.

There is, in my opinion, certainly mental damage, residual mental damage resulting to the victim in this case. There's no question that - - I don't know if she'll ever fully overcome the consequences of it and believe that that factor weighs favorable towards applying this particular sentencing factor for consecutive sentencing. She seems to have dealt with it well, but there's no doubt that she's still dealing with it and I think she will continue to deal with it. Apparently and fortunately, through the therapy, she's learned some skills in trying to cope with the events that occurred on this particular occasion. But in looking at all these factors together, I don't think that they are sufficient enough to apply that particular factor.

-14-

I have no evidence that he was on probation and this doesn't [amount to] criminal contempt, and he's not serving any other sentence.

Finding that he has a history of extensive criminal activity, the court is going to run counts one, two and three concurrently with each other, counts five, six and seven concurrently with each other, but consecutive to counts one, two and three; that will be a total effective sentence of seventeen years.

This Court has previously upheld consecutive sentencing for a defendant with no prior criminal record who was convicted of eight crimes in a single trial based on the fact that the defendant's record of criminal activity was extensive. See State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992). We conclude that the trial court did not abuse its discretion in ordering consecutive sentences. The trial court considered the applicable sentencing guidelines, and the record supports the trial court's decision. The appellant had at least one prior conviction and admitted an extensive history of illegal drug use. This issue is without merit.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE